UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Effie Mayhew                        )
         Plaintiff,              )
                                    )
v.                                  )    Civil Action No. 2:15-cv-147
                                    )
Hermitage Club, LLC                 )
         Defendant.              )
_____)

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant, Hermitage Club, LLC ("Hermitage Club"), respectfully submits the following Statement of Undisputed Material Facts pursuant to Fed. R. Civ. P. 56 and Local Rule 56(a).

1. Plaintiff, Effie Mayhew, was employed as a full time grounds-keeper in the Building and Grounds department at the Hermitage Club from April 14, 2014, until August 25, 2014. Affidavit of Michael Quinn at ¶ 2.

2. Ms. Mayhew did not have an employment contract with the Hermitage Club. Affidavit of Michael Quinn at ¶ 3.

3. Ms. Mayhew was supervised by Michael Quinn, Vice President and Operations Manager at the Hermitage Club, and Benjamin Fritz, the Building and Grounds manager at that time. Affidavit of Michael Quinn at ¶¶ 1, 4.

4. When Ms. Mayhew had conversations with Michael Quinn, she felt that he listened to her and treated her with respect, kindness, and compassion. Deposition of Plaintiff (**Exhibit N**) at 61.

5. Prior to June 2014 the Hermitage Club was paying a local stable called Adam's Farm to care for its two horses. Affidavit of Michael Quinn at ¶ 6.

1

6. Although Ms. Mayhew's job description did not include horse care duties, Mr. Fritz assigned some horse care duties to Ms. Mayhew in or around early June 2014 because she had expressed interest in working with the Hermitage Club's two horses. Deposition of Plaintiff at 83, 87; Affidavit of Michael Quinn at ¶ 7; **Exhibit A**.

7. Nobody disagreed with Ms. Mayhew in or around June 2014 that the horses needed more attention. Deposition of Plaintiff (**Exhibit N**) at 98.

8. However, by the end of July, Ms. Mayhew was spending a significant portion of her working time with the horses at the Hermitage Club. Affidavit of Michael Quinn at ¶ 8.

9. As this was diverting her from her grounds-keeping duties, Mr. Quinn began considering options for making sure all of these functions were adequately staffed, including the possibility of hiring another grounds-keeper either part time or full time. Affidavit of Michael Quinn at ¶ 8.

10. The Hermitage Club paid a local landscaping company to handle some of Ms. Mayhew's gardening responsibilities in July and August 2014. Affidavit of Michael Quinn at ¶ 9.

11. On July 17, 2014, Ms. Mayhew emailed Mike Quinn information she had been researching for a possible equestrian center at the Hermitage Club, and stated: "I would really love to sit down and chat more about it and talk about ways I can help through the entire process from planning to management." **Exhibit O**.

12. Ms. Mayhew spent time researching her ideas regarding the horses and an equestrian center and developed a business plan because she was hoping that the Hermitage Club would create a full time year round equine manager position for her. Mr. Quinn and Mr. Fritz never asked her to be involved in planning the equestrian center. Although some people who were involved in the equestrian center project may have asked for her ideas,

nobody in Hermitage Club management ever requested that she spend time doing research related to that project. Deposition of Plaintiff (**Exhibit N**) at 108, 111-112, 127-129; **Exhibits C, O**.

13. Ms. Mayhew did not know what the timetable was for the Hermitage Club's master plan; she did not know whether it would be years or even decades before Hermitage Club built an equestrian center. Deposition of Plaintiff (**Exhibit N**) at 108. No equestrian center has yet been built at the Hermitage Club. *Id*.

14. From approximately late July 2014 until late August 2014, the Hermitage Club paid for the horses to be boarded off site with Ann Brown at Brookside Stables for 30 days so that Ms. Mayhew could take driving lessons that the Club was also paying for. Deposition of Plaintiff (**Exhibit N**) at 135–137, 177; Deposition of Ann Brown (**Exhibit P**) at 37.

15. Ann Brown, owner of Brookside Stables, is a horse professional who has been working with horses for many years. Deposition of Ann Brown (**Exhibit P**) at 8, 180.

16. Ms. Mayhew had voluntarily sought out Ms. Brown to provide her with an estimate for training on how to drive horses because she was interested in learning a new skill in the hopes of obtaining a promotion at the Hermitage Club. Deposition of Plaintiff (**Exhibit N**) at 137; Deposition of Ann Brown (**Exhibit P**) at 10-11, 14-15.

17. On August 4, 2014, Ms. Mayhew sent a lengthy email to Mike Quinn, Ben Fritz and Rob Aubin, which concluded with a request that the Hermitage Club create "a full time, year round Equine Manager position" and give that position to Ms. Mayhew. In support of this request, Ms. Mayhew provided some personal background to explain her interest in the position, quantified the number of hours she felt she needed to work with the horses, and expressed some ideas for utilizing the horses and developing an equestrian center,

3

which was being considered in connection with the Club's long range master plan. Mr. Quinn told Ms. Mayhew that he needed time to review the information she had provided and that he wanted to meet with her later in the week to discuss it. Affidavit of Michael Quinn at ¶ 10; **Exhibit C**; Deposition of Plaintiff (**Exhibit N**) at 146-147.

18. On August 5, 2014, Ms. Mayhew emailed Mr. Fritz her proposed business plan for the horses. **Exhibit Q**. This business plan was based on research Ms. Mayhew had done in July 2014. Deposition of Plaintiff (**Exhibit N**) at 129-134.

19. Around mid-August 2014 Mr. Quinn met with Mr. Aubin and Mr. Fritz to discuss the horses and a potentially expanded role for Ms. Mayhew. Affidavit of Michael Quinn at ¶ 12.

20. On August 14, 2014, Mr. Quinn provided Mr. Fritz and Mr. Aubin with his notes from this meeting, which included questions as to when Ms. Mayhew expected the horses would be ready and how much time she would need to work with them, Mr. Quinn's own **proposal** for providing a profit incentive to Ms. Mayhew **if** she were to be given such a position, and an acknowledgment that a more complete business plan would be required in order to assess the cost and timing for the development of an equestrian center. Affidavit of Michael Quinn at ¶ 12; **Exhibit E**. Mr. Fritz showed these notes to Ms. Mayhew. Deposition of Plaintiff (**Exhibit N**) at 196.

21. Ms. Mayhew's belief that the Hermitage Club had promised her "shared revenue and a promotion" was based solely on Mr. Quinn's August 14, 2014, proposal notes that Mr. Fritz had shown to her. Deposition of Plaintiff (**Exhibit N**) at 196-197; *see also* Plaintiff's responses to Defendant's interrogatory nos. 12, 13, 17 (**Exhibit R**), Attorney McCave's Oct. 20, 2015, letter to Attorney Earle, and emails between Attorney Ellis and

Attorney Earle, attached as **Exhibit S** (documenting Plaintiff's refusal to respond to Defendant's contention interrogatory requesting the facts that support her promissory estoppel claim, her failure to provide any detail in response to Defendant's interrogatories regarding the alleged promises made to her by the Hermitage Club or agreements she entered into with the Hermitage Club, and her refusal to supplement her interrogatory responses).

22. At about this same time, Mr. Quinn hired a new employee, RG, to assist and share horse care duties with Ms. Mayhew. He also made inquiries of experienced horse owners as to the amount of time necessary to provide adequate care for the horses. Affidavit of Michael Quinn at ¶ 13.

23. On Wednesday, August 20, 2014, Ms. Mayhew sent another lengthy email to Mr. Quinn and Mr. Fritz with her business plan and timeline attached as well as a document quantifying the number of hours she felt she needed to work with the horses. In this email Ms. Mayhew threatened to refuse to work with the horses at all unless she was permitted to work full time with them and provided with a part-time assistant. Deposition of Plaintiff (**Exhibit N**) at 158-159; Affidavit of Michael Quinn at ¶ 14; **Exhibit G**.

24. In this email Ms. Mayhew complained that her other job responsibilities as a gardener were too time-consuming and stated: "if that's your magic number for the amount of time you're going to allow me to work with [the horses], it's not going to work." **Exhibit G**.

25. Ms. Mayhew also explained to Mr. Quinn and Mr. Fritz in this email that the work she was performing and the opinions she was expressing related to the horses were not motivated by Mr. Quinn's August 14 incentive proposal and that she "was really excited

about helping Mr. Barnes make one of his 'visions come to fruition because it also happened to coincide with one of [her] own 'dreams'." **Exhibit G**.

26. Ms. Mayhew further stated in this email that she was frustrated that "the pasture prep that happened was not what I had discussed with Ben on Friday" and that she knew "it was done with the best of intentions, but it is a perfect example of my WORDS not being heard." **Exhibit G**. Two days earlier she had expressed her annoyance to Mr. Fritz that he had not graded the pasture the way she felt that it should be done. Deposition of Plaintiff (**Exhibit N**) at 181-182.

27. Mr. Quinn felt that Ms. Mayhew's email made it clear that she felt that she knew what was best for the horses and would not accept any contrary views. Affidavit of Michael Quinn at ¶ 14.

28. On or about Thursday, August 21, 2014, Mr. Quinn met with Ms. Mayhew and expressed his frustration that although the Hermitage Club management had consistently tried to give her everything she asked for relating to the horses, they were probably not going to reach agreement on her current demands. Affidavit of Michael Quinn at ¶ 15.

29. As of the end of the day on Friday, August 22, 2014, Mr. Quinn and Mr. Fritz had still not reached any final conclusions as to how to best allocate horse and grounds-keeping duties between the employees in Mr. Fritz's department. Affidavit of Michael Quinn at ¶ 16.

30. Mr. Quinn sent an email to Ms. Mayhew at the end of the day on August 22, 2014, proposing that she spend 1.5 hours per day completing her driving lessons and spend an additional 1.5 to 2 hours per day exercising the horses, and informing her that they were still considering options for horse care and that until a decision is made regarding longer

term horse care, the grounds-keeping team would be responsible for that under Mr. Fritz's leadership. Mr. Quinn told her that they could continue the discussion over the next two weeks and instructed her to contact him if she had any questions or concerns about any of this. Affidavit of Michael Quinn at ¶ 16; Deposition of Plaintiff (**Exhibit N**) at 161-162; **Exhibit I**.

31. That evening Ms. Mayhew had a heated and disrespectful argument with Mr. Fritz because she disagreed with his decision to take down the fence she had put up in the horses' pasture area. In her opinion the horses would be exposed to poisonous plants without the fence there to keep them out of the wooded pasture area. During this argument she told Mr. Fritz: "if something was to transpire and happen to the horses, I would make sure that everyone knew that it was his decision to do that, so much so that he went behind my back and took the fencing down." After this argument Ms. Mayhew put the fence back up where she wanted it even though she had not been given permission by her supervisors to do so. Deposition of Plaintiff (**Exhibit N**) at 164-166, 181-182, 185-186.

32. Ms. Mayhew did not refer to any professional standards relating to horse care in deciding what was appropriate for the horses. Her opinions were based on what she believed to be "common sense horse knowledge." Deposition of Plaintiff (**Exhibit N**) at 186-187.

33. Ms. Mayhew believed it was her job to second-guess Mr. Fritz's decisions regarding the horses based on her own personal morals. Deposition of Plaintiff (**Exhibit N**) at 170-171.

34. During her employment at the Hermitage Club Ms. Mayhew never specifically threatened to call the Humane Society, law enforcement, or any regulatory body regarding her purported concerns about the horses. Deposition of Plaintiff (**Exhibit N**) at 166, 178-

179.

35. Ms. Mayhew did not report her concerns about the horses to the Windham County Humane Society until May 2015 (nine months after her employment was terminated). Deposition of Plaintiff (**Exhibit N**) at 166-167. In response to Ms. Mayhew's complaints, the Humane Society investigated the well-being and safety of the horses, including a visit to the Hermitage Club property. In an email to Ms. Mayhew the Humane Society representative stated: "I've been to the Hermitage Inn and I have seen the grazing turnout area the horses are in. It is more than adequate. I understand your concerns about non-edible, potentially harmful, plants as far as horses go. These horses, however, are not malnourished. They are on a regular feed schedule and are given hay daily. They have been turned out in the area before while the other turnout area is being reseeded and did just fine." Deposition of Plaintiff (**Exhibit N**) at 168-169.

36. Ms. Mayhew disagreed with the Humane Society's assessment that the Hermitage Club's decision to allow the horses to graze in the wooded pasture area was not endangering their safety. She admits that this is an example of a situation where people of good faith disagree regarding their beliefs about appropriate horse care. Deposition of Plaintiff (**Exhibit N**) at 169.

37. Ms. Mayhew failed to discuss any of her concerns with her supervisor, Mr. Quinn, related to her recent disagreements with Mr. Fritz even though Mr. Quinn had instructed Ms. Mayhew on August 22, 2014, to discuss such matters with him. Instead, Ms. Mayhew disregarded the management hierarchy and contacted the Hermitage Club's President, Jim Barnes. Deposition of Plaintiff (**Exhibit N**) at 162, 164, 184; **Exhibits I, J**.

38. On the morning of Monday, August 25, 2015, Mr. Quinn received an email message from the Hermitage Club's President, Jim Barnes, forwarding a lengthy email message Mr. Barnes had received from Ms. Mayhew that morning, and asking Mr. Quinn to "Please handle."  Affidavit of Michael Quinn at ¶ 17; **Exhibit J**; Deposition of Plaintiff (**Exhibit N**) at 172-173.

39. In that email Ms. Mayhew complained to Mr. Barnes about Mr. Quinn's decision to leave Mr. Fritz in charge of the horses' care and stated that "[m]ost horse people treat their horses better than their family members."  Deposition of Plaintiff (**Exhibit N**) at 172-173; **Exhibit J**.

40. Ms. Mayhew disparaged her supervisors in that email to Mr. Barnes and asserted that nobody at the Hermitage Club but her was "seeing the BIG picture with [the horses] and the importance of their care and well-being."  **Exhibit J**.

41. Ms. Mayhew's admits that her email to Mr. Barnes was motivated in part by her concern about the Hermitage Club's reputation and she has characterized her email as "advocating for [Mr. Barnes'] assets."  Deposition of Plaintiff (**Exhibit N**) at 173-174.

42. Mr. Quinn felt that this email made it clear that Ms. Mayhew had completely disregarded his conversation with her on Thursday and his instructions on Friday that she get back to him with any questions or concerns about his proposal, and had instead gone above his head to the President of the company in an effort to advocate for the full-time horse care position she wanted.  Affidavit of Michael Quinn at ¶ 17.

43. While Mr. Quinn had initially been pleased at Ms. Mayhew's willingness to take on some of the duties of caring for the horses, he was not persuaded of the necessity of accepting her opinions and acceding to her demands on every issue because she lacked formal

9

expertise or experience. Although her concerns were always taken seriously and her suggestions were often accepted by Hermitage Club management, Mr. Quinn felt that she increasingly sought to impose her own personal opinions and expectations regarding not only the care and utilization of the horses, but also her own position with the Club, and the substance and tone of her demands became increasingly disrespectful and insubordinate. Affidavit of Michael Quinn at ¶ 18.

44. Upon considering all of this, Mr. Quinn decided to terminate Ms. Mayhew's employment for insubordination. Mr. Quinn communicated his decision to Mr. Fritz in an email message. Although he gave Mr. Fritz discretion to either terminate Ms. Mayhew's employment effective immediately or to place her on a brief paid leave until the effective date of her termination, Mr. Quinn's decision to terminate her employment was final. Accordingly, in his email Mr. Quinn also provided Mr. Fritz with suggested language for communicating the decision to Ms. Mayhew. In response to Mr. Quinn's email Mr. Fritz informed him that he didn't see any point in placing her on leave, Mr. Quinn told Mr. Fritz that he didn't disagree, and Mr. Fritz thanked Mr. Quinn for his support. Affidavit of Michael Quinn at ¶ 19; **Exhibit K**.

45. Mr. Fritz met with Ms. Mayhew on the morning of Tuesday, August 26, 2015, and carried out Mr. Quinn's instructions when he informed her that her employment was terminated. That meeting was recorded by Mr. Fritz and Ms. Mayhew. Mr. Quinn has listened to the audio recording of this meeting and he is satisfied that Mr. Fritz carried out his instructions in terminating Ms. Mayhew's employment. Affidavit of Michael Quinn at ¶ 20; Deposition of Plaintiff (**Exhibit N**) at 174.

46. Ms. Mayhew admits that, until Mr. Quinn declined to immediately agree to assign her to

spend the number of hours that she demanded to work with the horses in late August, the Hermitage Club had given her everything she had asked for related to the horses. Deposition of Plaintiff (**Exhibit N**) at 84, 185-186; Affidavit of Michael Quinn at ¶ 15.

47. Ann Brown testified that she hasn't "met a horse person yet that didn't have differences of opinion." Deposition of Ann Brown (**Exhibit P**) at 44.

48. Ms. Mayhew admits that she has no reason to believe that her alleged complaint to Mr. Fritz that his negative comments about an employee who had taken military leave were illegal had anything to do with the termination of her employment. Deposition of Plaintiff (**Exhibit N**) at 193-196.

49. At all times relevant to this litigation, the Hermitage Club displayed a poster entitled "Employee Rights under the Fair Labor Standards Act" in a location where the employees could view it. Defendant's response no. 4 to Plaintiff's interrogatories, attached as **Exhibit T**.

50. Ms. Mayhew was aware that she must notify Mr. Quinn or Mr. Fritz about any hours she worked when she had not been able to punch in or out, or when she was not physically on the property. If she asked them to enter time into the system for her, they did so and she was paid for that time. Deposition of Plaintiff (**Exhibit N**) at 77, 80-82, 87; Defendant's response no. 4 to Plaintiff's interrogatories, attached as **Exhibit T**.

51. Ms. Mayhew was also made aware by Hermitage Club management that there was a missed punch form she could use to report any time she worked when she was unable to punch in or out. Deposition of Plaintiff (**Exhibit N**) at 77.

52. Nobody at Hermitage Club ever told Ms. Mayhew that she would not be paid for the hours that she worked. Deposition of Plaintiff (**Exhibit N**) at 81, 117.

53. On several occasions, including via text messages on April 14, 2014, and on May 22, 2014, Ms. Mayhew informed Mr. Fritz that she was unable to punch in or out and he made sure that the time she reported working was entered into the system. Deposition of Plaintiff (**Exhibit N**) at 77, 87; Text messages between Plaintiff and Mr. Fritz, attached as **Exhibit U**.

54. On June 5, 2014, Mr. Fritz gave Ms. Mayhew access to a computer on the Hermitage Club property to use for working on her internet research related to the horses. Ms. Mayhew also informed Mr. Fritz that she had brought her own laptop to the Hermitage Club property to work. Deposition of Plaintiff at 94 - 97; **Exhibit U**.

55. Mr. Fritz never told Ms. Mayhew that she should be performing any of this research at home. Deposition of Plaintiff (**Exhibit N**) at 117.

56. Ms. Mayhew was paid for the time she spent in July 2014 researching ideas related to the horses that she had been discussing with Mr. Fritz. Deposition of Plaintiff (**Exhibit N**) at 148.

57. On July 3, 2014, Ms. Mayhew sent a text message to Ben Fritz to inform him that she did not have her time card and that she had filled out a missed punch sheet which she left for him on the clipboard in the horse barn at the Hermitage Club. Deposition of Plaintiff (**Exhibit N**) at 113; Plaintiff's text message to Mr. Fritz, **Exhibit U**.

58. On August 7, 2014, Ms. Mayhew emailed Michael Quinn and Ben Fritz that she had worked hours the day before that she had not entered into the system because she had forgotten her timecard, and Mr. Quinn added that time into the system. She also asked for assistance in entering her hours of work into the Hermitage Club payroll system without her time card, and Mr. Quinn provided her with this information. Affidavit of

Michael Quinn at ¶ 11; Deposition of Plaintiff (**Exhibit N**) at 79-80; **Exhibit D**.

59. When Ms. Mayhew sometimes rode the horses at the Hermitage Club on her days off, she was doing that because she enjoyed it and not because it was part of her job. She spent at most a total of 10 hours riding the horses on her days off during the summer of 2014. Deposition of Plaintiff (**Exhibit N**) at 162-163, 189.

60. Ms. Mayhew was paid for the hours she spent taking horse driving lessons at Brookside Stables. Deposition of Plaintiff (**Exhibit N**) at 81.

61. Ms. Mayhew was paid by the Hermitage Club for the time she spent visiting the proposed equestrian center site with her significant other. Deposition of Plaintiff (**Exhibit N**) at 112-113.

62. On at least one occasion, Ms. Mayhew submitted a handwritten account of hours she had worked, and she was paid for that time. *See* Deposition of Plaintiff (**Exhibit N**) at 155-156; **Exhibit V**.

63. Ms. Mayhew was paid for all regular and overtime hours she worked that she entered into the punch clock or otherwise reported to Hermitage Club management. Deposition of Plaintiff at 81-82, 112-113, 120; Affidavit of Michael Quinn at ¶ 21.

64. The total hours Plaintiff reported working for the Hermitage Club was 757.25. *See* Plaintiff's timesheets (**Exhibit L**).

65. Plaintiff's hourly rate was $15 per hour, and she was paid a total of $11,878.14 in regular and overtime wages during the time she worked for the Hermitage Club. *See* Plaintiff's payroll records (**Exhibit M**).

66. Ms. Mayhew did not keep track of the hours she allegedly performed work for the Hermitage Club for which she claims she was not compensated and admits that the

documents she has produced in discovery, which are all that she has, are insufficient for her to determine how many additional hours she allegedly worked. Deposition of Plaintiff (**Exhibit N**) at 190-192; Plaintiff's response no. 14 to Defendant's interrogatories, attached as **Exhibit R**.

67. Plaintiff rejected the Hermitage Club's July 16, 2015, offer of judgment for $3000, which would have fully compensated her for the 100 additional hours of regular and overtime work that she allegedly performed. *See* **Exhibit W**.

DATED at Springfield, Vermont this 3rd day of December 2015

        **ELLIS BOXER & BLAKE PLLC**
        Attorneys for Defendant

        By: /s/ Jennifer M. McCave
            Stephen D. Ellis, Esq.
            Jennifer M. McCave, Esq.
            24 Summer Hill Street
            P.O. Box 948
            Springfield, VT 05156
            802/885-2141
            802/885-2131 (fax)
            sdellis@ellisboxer.com
            jmmccave@ellisboxer.com