**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

EFFIE MAYHEW, :
Plaintiff, :
v. : Case No. 2:15-cv-00147
HERMITAGE CLUB, LLC, :
Defendant. :

**OPINION AND ORDER**

Plaintiff Effie Mayhew ("Mayhew") brings this action against her former employer, Defendant Hermitage Club, LLC ("Hermitage Club"), alleging that she was wrongfully discharged in violation of public policy, that Defendants failed to pay her for time worked in violation of the Fair Labor Standards Act and Vermont wage and hour laws, and that she was wrongfully discharged in violation of an implied modification to her at-will contract established by promissory estoppel. Defendant filed a motion for summary judgment on each of these claims. For the reasons outlined below, the Court denies summary judgment on Plaintiff's claim of wrongful discharge in violation of public policy, but grants summary judgment on Plaintiff's wage and hour and promissory estoppel claims.

**FACTS**

Mayhew began working as a groundskeeper for the Hermitage Club in mid-April of 2014. Her supervisors were Benjamin Fritz ("Fritz"), the Building and Grounds manager at the time, and Michael Quinn ("Quinn"), Vice President and Operations Manager of the Hermitage Club. As part of her search for a renewed sense of meaning in her work, Mayhew took an interest in the company's horses, Will and Bill. At that time, Defendant had engaged outside contractors to feed and care for the horses. Mayhew observed deficiencies in the horses' care: notably, she testified that the horses' hooves were overgrown, cracked, and improperly shod, that their chestnuts were not properly trimmed, that their manes and coats were matted and unkempt, and that the horses had sores on their legs that were oozing and appeared infected. She shared some of these concerns and observations with Fritz. Although Fritz has testified that he did not recall these physical markers of neglect, he expanded Mayhew's duties to include care for Will and Bill.

Mayhew spoke to Hermitage Club management about the horses at a social gathering shortly thereafter and began to discuss the company's possible plans for their use as working horses with several different managers in the company. After Hermitage Club managers expressed interest in getting the horses to become

commercially useful, Mayhew began taking driving lessons to be able to provide carriage and sleigh rides for guests at the Hermitage Inn. Mayhew also researched selections of a horse wagon, sleigh and carriage for management to consider, which Defendant’s manager later purchased. Over the months of June and July, Mayhew had further conversations with these managers about their future plans for Will and Bill. Defendant’s managers informed Mayhew that the Inn was considering building a high-end Equestrian Center that would offer clinics, riding lessons and training. Mayhew researched possible materials and design of a suitable equestrian center.

On August 4th, 2014, Mayhew sent Defendant’s managers an email laying out her estimates for the amount of time that she believed would be required to properly care for the horses in order to prepare them to give carriage and sleigh rides. She stated that she was working with the horses “on her own time.” Based on the responsibilities laid out in that email, Mayhew requested that the company create a full-time equine manager position and give that job to her. On August 14th, Quinn sent an email to Fritz and Rob Aubin, the manager who had initially engaged Mayhew on the idea of providing carriage and sleigh rides. In that email, Quinn requested an account of the training hours and other duties that would be necessary per day and week for the company’s horse venture, stating that “the ultimate goal

is to have the horses start making money, with limited expenses at this time." He then proposed an incentive agreement in which a percentage of sales would be paid directly to Mayhew for her involvement with revenue-generating horse activity. He requested that Mayhew "commit to being the representative" for the Horse Center in order to take responsibility for these tasks.

Fritz shared this information with Mayhew, and he and Quinn encouraged her to develop a business plan for the profitable use of horses in the future. Mayhew submitted a plan for their consideration. At least some of this work was performed during her time on-site, and Mayhew claims that some was performed off-site on her own time. Fritz testified that he did not know when Mayhew worked on these projects. On August 20th, after submitting the plan, Mayhew sent an email to Quinn and Fritz quantifying the hours that she believed she needed to work with the horses in order to accomplish the company's business objectives and requesting support with the horse-care tasks. In that email, Mayhew also expressed frustration with Fritz' modifications to the horses' pasture. Quinn responded by stating that he was also growing frustrated and offering to talk. Quinn met with Mayhew on August 21st, and sent her a follow-up email on August 22nd suggesting an interim plan for the horses until management made a decision about their future plans. He explained that the care

of the horses would remain under Fritz' leadership until that point.

Between August 22nd and August 25th, Mayhew again raised concerns with Fritz about the risks posed by the horses' pasture area, which she claimed might contain poisonous plants. Mayhew stated that if the horses were harmed by his decision to let them pasture in that area, she would disclose to everyone that Fritz had disregarded her advice. Fritz disregarded these concerns and took down a fence that Mayhew had erected to keep the horses from pasturing in the area that she believed contained poisonous plants.

At this point, Mayhew sent an email to Hermitage Club owner Jim Barnes ("Barnes"). She alleged that Fritz was "forcing [her] to turn [the horses] out in the wooded area that's fenced in, even though I have explain[ed] this is not good for them because there are … poisonous plants growing in that area. Plants that can cause ulcers, brain bleeding and death within hours." She also alleged that the horses were improperly fed, that other staff did not appear to understand the importance of the horses' health and that others had recognized the improved care that the horses were receiving since she was assigned to look after them. She stated that she would "probably lose [her] job for this but [she] couldn't in good conscience 'walk away' without telling [Barnes] what is being done with YOUR horses." *Id.* Barnes

forwarded the email to Quinn and Fritz instructing them to "please handle" and stating that "we can use brook bound property also". *Id.*

The day after Mayhew sent this email, Fritz terminated her from her employment. Fritz stated that he was terminating her because of her threatening conduct. He did not mention the email to Barnes and did not claim that Mayhew had otherwise failed to meet her other duties. Quinn testified that Mayhew's email to Barnes was a basis for terminating her employment. In a written document that Fritz composed after he terminated Mayhew, he alleged that Mayhew had fallen behind in her grounds keeping work as a result of her horse-care duties and that, after Mayhew sent the email to Barnes, the relationship between Mayhew and her supervisors "appeared too far gone to repair as we would not be able to reach common ground or agreement".

**STANDARD OF REVIEW**

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[O]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655

(1962)) (internal quotations omitted). However, summary judgment must be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## DISCUSSION

### I. Wrongful discharge in violation of public policy

*a. Legal framework*

In resolving claims of wrongful discharge in violation of public policy, Vermont courts have relied on cases involving claims under the Vermont Fair Employment Practices Act (VFEPA). *Adams v. Green Mountain Rlrd.*, 862 A.2d 233, 235 (Vt. 2004); *Regimbald v. Gen. Elec. Co.*, No. 2:05-CV-161, 2007 WL 128963, at *3 (D. Vt. Jan. 12, 2007) (applying *McDonnell Douglas* standard to wrongful discharge in violation of public policy claim). "[U]nder VFEPA, the standard and burdens of proof are identical to those under Title VII." *Gallipo v. City of Rutland*, 882 A.2d 1177, 1182 (Vt. 2005) (internal quotations omitted); *Hodgdon v. Mt. Mansfield Co.*, 624 A.2d 1122, 1128 (Vt. 1992). Therefore, Vermont courts require a plaintiff bringing a claim under VFEPA to establish a prima facie case by applying the burden-shifting framework established by the U.S. Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411. U.S. 792, 802-804 (1973). Plaintiff must show that (1) she engaged in a protected activity; (2) the employer was aware of the activity; (3) Plaintiff suffered adverse employment consequences as a result of the activity; and (4) there was a causal connection between the activity and the consequences." *Griffis v. Cedar Hill Health Care Corporation*, 968 A.2d 1141 (2008). A plaintiff's burden at this stage is not onerous, and a causal connection can be shown by circumstances which give rise to an inference of unlawful discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, (1981).

Generally, if the plaintiff makes out a prima facie case, the burden shifts to the defendant to proffer a legitimate, lawful reason for the adverse employment action. *McDonnel Douglas,* 411 U.S. 802. If the defendant provides such a reason, the burden then shifts back to the plaintiff. In mixed-motive cases, the Second Circuit has found that "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors". *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir. 2008) (internal quotations omitted) (quoting *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995)); *see also Fields v. N.Y. State*

*Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 120 (2d Cir.1997) (finding that a plaintiff alleging mixed motives may establish that the "impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation").[1] A plaintiff can show that a protected trait was a "motivating factor" in an adverse employment action with either direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).

To establish that she engaged in protected activity for purposes of a prima facie case, Mayhew must show that the alleged reason for her termination violates public policy. *Payne v. Rozendaal*, 520 A.2d 586 (Vt. 1986). "Public policy may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like. *Id.* at 588 (quoting *Pittsburgh, Cincinnati, Chicago & St.*

[1] Defendants argue in a footnote that to prevail on her retaliation claim, Plaintiff must prove that her comments were the but-for cause of the termination of her employment, citing the U.S. Supreme Court's decision in *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521 (2013). In that case, the Court found that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action" and that mixed-motive claims would therefore not be recognized. However, the case law on wrongful discharge in Vermont references VFEPA precedents in establishing the appropriate standards, and VFEPA case law in turn looks to Title VII's anti-discrimination precedents. Moreover, in *Adams*, the Supreme Court upheld a lower court jury instruction that would require the jury to find that the protected activity was "the sole *or principle* reason for the termination", implicitly recognizing that the adverse employment action could have more than one cause. *Adams v. Green Mountain Rlrd.*, 862 A.2d 233, 235 (Vt. 2004) (emphasis added).

*Louis Railway v. Kinney,* 115 N.E. 505 (Ohio 1916)). "[S]ometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people-in their clear consciousness and conviction of what is naturally and inherently just and right between man and man." *Id. at* 492–93. Even where the letter of the law would not have prevented an employer's actions, the Court may use this common law remedy to advance the interests and values underlying statutory provisions. *Id.* at 495 (finding a "clear and compelling public policy" against age discrimination even though Vermont statutes did not specifically prohibit age discrimination at the time, because such behavior was already prohibited by the federal law and was later prohibited by the state legislature); *see also Belline v. K-Mart Corp*., 940 F.2d 184, 188 (7th Cir. 1991), *reh'g denied* (Aug. 22, 1991) ("an employee's retaliatory discharge claim should not turn on the happenstance of whether the irregular conduct she reports is actually criminal. Public policy favors the exposure of *apparently* criminal activity. That the questionable conduct may later prove to be authorized and therefore legitimate is not dispositive."). However, where "redress [is] sought for private concerns", such as asserting one's rights to vacation and sick leave or a refusing to sign a non-compete agreement, the Supreme Court has found no wrongful

discharge claim. *Id.* at 495. Furthermore, an employee cannot bring a wrongful discharge claim for a termination arising from a mere difference of professional judgment. *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A. 2d 390, 397 (Vt. 2002).

In this case, Mayhew alleges that she was wrongfully discharged because she expressed concerns about the neglect and mistreatment of the horses to the Hermitage Club management and because of her comments in support of a coworker who was on leave for military service. Under the standard set forth above, however, Mayhew provides sufficient evidence to survive a summary judgment motion only with respect to her first argument.

b. *Claim of termination due to allegation of mistreatment of horses*

Mayhew has put forth sufficient facts to make out a prima facie case of wrongful discharge in violation of Vermont's public policy on the treatment of animals. Vermont law penalizes many forms of animal cruelty, including the acts of denying an animal "adequate food, water, shelter, rest, sanitation, or necessary medical attention" and restraining an animal when it is detrimental to that animal's welfare. 13 V.S.A. §352(4); *State v. Gadreault*, 758 A.2d 781, 784–85 (2000) (explaining that the Vermont legislature has gradually expanded the types of animal cruelty that would be penalized). Mayhew's behavior advanced this state policy. The record shows that Plaintiff

expressed concern about the horses' minimal welfare, separate and apart from the conditions necessary for their use for commercial purposes and the conditions of her employment. She repeatedly alleged that the attention that the horses had received before she took over their care was inadequate, not only in order to get the horses in a position to generate revenue but also according to conventions for decent animal care. Mayhew testified that the horses had sores on their legs that were oozing and appeared infected and that their hooves were overgrown, cracked and improperly shod, which could pose a potential risk to the horses' health. Although she did not specifically reference the state's animal cruelty laws, she indicated that she believed that the conditions in which the horses were kept before she was assigned to look after them could have required the intervention of state authorities. She also alleged that the grazing conditions could pose a risk of death to the horses. These comments clearly implicate the values underlying Vermont laws prohibiting the mistreatment of animals. The fact that Mayhew never actually reported the Hermitage Club to the authorities during the time that she was employed there, and only called the Humane Society months after her employment at the Club had ended, does not bar her claim. *See LoPresti,* 865 A.2d at 1106 (finding wrongful discharge in violation of public policy in a case involving an internal

dispute over conduct that could have violated a professional ethics code, even though the violation was not reported to outside authorities); *Belline v. K-Mart Corp*., 940 F.2d at 188 (employee "should not be penalized because he availed himself of internal procedures rather than notifying the police"). Similarly, Mayhew need not have explicitly referenced the state's animal cruelty laws or even identified an actual legal violation in order for her statements to implicate public policy concerns. *See Payne*, 147 Vt. at 492 (1986); *Belline*, 940 F.2d 184.

Moreover, there is no doubt that Mayhew's employer knew of Mayhew's complaints, even though Fritz testified that he was not aware of the horses' mistreatment before Mayhew took over their care. According to Mayhew, Quinn was aware that the Humane Society had previously been called in to check on their wellbeing. Certainly, however, both Quinn and Fritz were aware that Mayhew made reports to this effect, thus engaging in protected activity.

In order to make out the third and fourth elements of a prima facie case, Mayhew must provide some evidence that she suffered adverse employment consequences as a result of the activity and that there was a causal connection between the activity and her termination. Here, Mayhew has provided some evidence that her concerns about the animals' basic welfare

triggered Defendant's decision to fire her. Fritz' statements contained in the transcript of his conversation with Mayhew about her termination[2] explain that he was terminating her because of her threatening behavior. In particular, Fritz references her threat to "let everybody know" that there were poisonous weeds in the horses' pasture if anything were to happen to the horses, saying that he "just can't have it." Fritz also referenced her threatening behavior more generally, without specifying which threats he was concerned about. However, in a document drafted by Fritz entitled "Effie Mayhew Employment Recap," he identifies that Effie threatened to "call and report" Fritz if the horses were to return to the condition they were in before. Although Mayhew denies that she ever made this threat directly, she stated that shortly after the horses were returned to the Hermitage Club, she told Quinn that the Humane Society might take a negative view of the horses' treatment if they were returned to the state that they had been in prior to her intervention.

Finally, Quinn stated that Plaintiff's email to Barnes was one of the reasons for terminating her employment. In that email, Mayhew expresses concern regarding the grazing area, but also highlights the fact that "some of our members, other staff and other people from the community" have told her "how great it

[2] Defendants take this transcript to be accurate for the purposes of the summary judgment motion. ECF No. 49, p. 3.

is that the Hermitage is finally taking care of the horses properly.” Thus, she explains her concern about her supervisors’ lack of interest in the horses’ well-being in the context of their prior neglect and her concern at the time about their exposure to poisonous grazing area. In this sense, both Mayhew’s report to Barnes and the purported threats that Fritz appeared to cite as the grounds for her termination center on Mayhew’s expressed concerns about the animals’ welfare, not on her negotiations over the conditions of her potential new role as the person primarily responsible for the horses if the company were to expand their commercial use. Since at least some of Mayhew’s statements cited by Defendant’s managers as the reasons for her termination relate to the animals’ welfare, the evidence demonstrates that her protected activity motivated Defendant’s decision to terminate her. Because a reasonable jury could find a causal connection between those statements and Mayhew’s ultimate termination, Mayhew has can make out a prima facie case of wrongful discharge on this record.

Nevertheless, while there are sufficient facts in the record to permit Plaintiff to establish a prima facie case that she was discharged due to her complaints about her employer’s mistreatment of the horses, there is also evidence showing that other factors weighed into the Hermitage Club’s decision to terminate her. Defendant also claims that Mayhew was fired

because her two-page email to Barnes "disparaged her supervisors", because she was too aggressive in the way she made her demands regarding the terms and conditions of her work and because she displayed behavior that Fritz viewed as loud, angry and aggressive. These behaviors, which Defendant characterizes as "insubordination", certainly constitute legitimate grounds to terminate an employee. The record provides support for Defendant's proffered reason. Barnes testified that in general, Mayhew should have approached her supervisors about her work concerns. Quinn and Fritz also stated that Plaintiff was aggressive, loud and angry in discussing their allegation that Mayhew was insubordinate. However, the Court need not determine whether Defendant's evidence regarding their proffered reason is convincing. Rather, it must ask whether Defendant has introduced evidence that, "*taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason." *Holcomb v. Iona Coll.,* 521 F.3d 130, 141 (2d Cir. 2008) (quoting *St. Mary's Center v. Hicks,* 509 U.S at 509 (1993). Here, the statements put forth by the three witnesses would support the conclusion that Mayhew was fired for insubordination if they were true.

However, because Plaintiff alleges that Defendant acted with mixed motives, she need not prove that Defendant's proffered reason was pretextual, as Defendant claims she must.

Rather, Plaintiff need only put forth sufficient evidence upon which a reasonable jury could conclude by preponderance of the evidence, and without the aid of the initial presumption raised by the prima facie case, that Hermitage Club's decision to terminate Mayhew was based, at least in part, on her reports of potential animal cruelty. *Holcomb v. Iona Coll*., 521 F.3d 130, 138 (2d Cir. 2008). Mayhew has satisfied this standard. Quinn recognized that Mayhew was terminated due to her email to Barnes, while Fritz references Mayhew's threats as a reason for her termination. Both Mayhew's threats and her email to Barnes expressed concerns about the horses' basic welfare. Therefore, a reasonable jury could conclude that Mayhew's allegations of animal mistreatment were at least a motivating factor for Defendant's decision to terminate her.

c. *Termination resulting from Mayhew's support for coworker on military leave*

Mayhew also claims that her termination was motivated in part by her response to her supervisor's statement that he wasn't going to let an employee who was away on military leave "get away" with his behavior again. Mayhew responded that terminating an employee because that person is in the National Guard and took military leave might be unlawful. However, even assuming that the Mayhew's comment constitutes protected activity, Mayhew has failed to meet her burden to establish a causal connection

between this statement and Defendant's decision to terminate her. Fritz did not mention the incident to Mayhew when he terminated her or in the document that he subsequently drafted regarding the reasons for her termination. Mayhew testified that she did not know whether her expressed concerns over Fritz' statement about this employee had anything to do with why she was fired. The mere fact that the incident preceded her termination is insufficient to make out a prima facie showing of wrongful discharge. *Adams v. Green Mountain Rlrd.*, 862 A.2d 233, 235 (Vt. 2004). Therefore, the Court denies summary judgment on Count One, but holds that Mayhew may proceed only on her claim of wrongful discharge in violation of Vermont's public policy on neglect and cruelty towards animals.

**II. Violation of wage and hour laws**

Defendant has also moved for summary judgment on Mayhew's claim for unpaid wages under Vermont's wage and hour statute, 21 V.S.A. §384 et. seq., and her claim for overtime under the Fair Labor Standard Act ("FLSA"), 19 U.S.C. §201 et. seq. Because Mayhew failed to meet her evidentiary burden in providing estimates of her unpaid work, the Court **grants** Defendant's motion for summary judgment on this count.

*a. There is a material dispute of fact regarding Defendant's knowledge of Mayhew's overtime hours*

Defendant first argues that it is undisputed that the Hermitage Club did not have the requisite knowledge of any hours that Mayhew was allegedly working off the clock sufficient to support a finding that the Hermitage Club suffered or permitted Mayhew to work. To prevail on a claim for unpaid wages under FLSA involving off-site work, a plaintiff must establish that her employer knew or had reason to believe that she had worked hours for which she had not been compensated. *Holtzapfel v. Town of Newburgh, N.Y.*, 145 F.3d 516, 524 (2d Cir. 1998). An employer's knowledge of the employee's overtime work need not arise concurrently with the performance of overtime. *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 287–88 (2d Cir. 2008). Furthermore, "[a]n employer who has knowledge that an employee is working, and who does not desire the work be done, has a duty to make every effort to prevent its performance… This duty arises even where the employer has not requested the overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours." *Id.* at 288 (citing *Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 718 (2d Cir.2001)).

In this case, there is at least a dispute of fact regarding Defendant's knowledge that Mayhew was working additional hours, sometimes off-premises. Defendant relies on Fritz' testimony that he had no knowledge that Mayhew was working on her own

time. However, this statement was disputed by Mayhew, who testified that she told Fritz that she was doing that work on her own time, but that she was not asking to get paid for that time. Moreover, in an email to her managers in which Mayhew proposes that the Hermitage Club expand her responsibilities with respect to the horses, she states that "I even work with them … on my days off on my own time because that is what they need in order to be [the] kind of horses we want to represent the Hermitage." Both Fritz and Quinn received the email. Finally, in a later email to Quinn and Fritz, Mayhew indicates that she is essentially willing to perform work for no pay for some time. These statements put Defendant on notice that Mayhew may have been performing uncompensated work.

To the extent that Defendant did not want this work to be performed, it was the Hermitage Club's duty to "make every effort to prevent its performance." *Chao* at 288. Here, Quinn met with Mayhew to discuss the possibilities regarding her future duties with the horses and determined that until a decision was made, she should continue to exercise the horses for 1.5-2 hours per day and take driving lessons for 1 hour per day. However, Quinn did not provide this instruction until August 22nd, although Mayhew first indicated that she was performing additional, uncompensated work on August 4th. Therefore, up until

that point, Quinn and Fritz failed to inquire into or make efforts to prevent Mayhew's uncompensated work time.

*b. Mayhew failed to meet her evidentiary burden in providing estimates of her unpaid work*

An employee who sues for unpaid minimum wages or overtime compensation has the burden of proving that the employer did not compensate her for completed work*. Grochowski v. Phoenix Const.*, 318 F.3d 80, 87 (2d Cir. 2003). However, the U.S. Supreme Court has created a burden-shifting framework applicable in circumstances "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946). The Court reasoned that requiring an employee to prove "the precise extent of uncompensated work" where he or she is deprived of proper and accurate records to prove his case would run contrary to the remedial nature of the FLSA. Therefore, the court found that "[i]n such a situation ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to [negate] the reasonableness of the inference to be drawn from

the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.” *Id.* at 687–88.

Hermitage Club relies on a decision from the Western District of New York to argue that the *Anderson* burden-shifting framework should not apply to this case. *Seever v. Carrols Corp.,* 528 F. Supp. 2d 159, 170-171. There, the Court held that the *Anderson* standard should not apply “where the time record deficiencies alleged by the employee are admittedly and voluntarily self-created.” *Id.* However, *Seever* has been superseded by a subsequent Second Circuit decision rejecting the logic underlying that holding. *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361–64 (2d Cir. 2011). In *Kuebel*, the Court held that since an employer's duty under the FLSA to maintain accurate records of its employees' hours is non-delegable, once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours. *Id.* at 363. Applying *Kuebel*’s rationale to this case, it is reasonable to require that Defendant ensure proper record-keeping of off-duty work hours where the employee has explicitly put her employer on notice that she was working without pay on her own time and the employer has not made a timely effort to prevent her from

undertaking this work. Therefore, the Court will apply the *Anderson* burden-shifting framework to this case.

"[I]t is possible for a plaintiff to meet [her] burden through estimates based on [her] own recollection" under this standard. *Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 362 (2d Cir.2011). However, there must be credible evidence that she performed overtime work and of the amount of such work. *Daniels v. 1710 Realty LLC*, 497 F. App'x 137, 139 (2d Cir. 2012). Thus, the Second Circuit has also upheld summary judgment in favor of an employer where the employee's testimony regarding his overtime work was "too vague to be credible." *Id.*

In this case, Mayhew provided no formal record or accounting of the number of hours she spent working for the Hermitage Club. She testified that she did not keep track of her hours. However, she estimated based on her recollection that she spent about 10 hours riding horses on her days off. She could not estimate how much of her research of the barns and carriages was done on the clock and how much was off the clock, and she could not provide further explanations about the additional 90 hours that she claimed she worked over her regular hours without pay in her complaint. She also did not provide any further breakdown or description of the tasks that she performed during those 100 hours in her interrogatory responses. Based on this evidence, there simply is not a sufficient basis for any jury to make a

just and reasonable inference regarding the amount and extent of that work. Therefore, Mayhew failed to meet her initial burden of proof under *Anderson*. In the absence of a more specific state standard, the Court finds that Plaintiff has also failed to carry her burden to establish the elements of her case under Vermont's overtime law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is warranted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial); *see also Baldwin v. Upper Valley Services, Inc.*, 644 A.2d 316, 320 (Vt. 1994) (upholding summary judgment where "plaintiff still had no specific factual support for his" overtime claim).[3] Therefore, the Court **grants** Defendant's request for summary judgment on Plaintiff's state and federal overtime claims under Count Two.

*c. Mayhew has failed to provide evidence of a minimum wage violation*

Neither party disputes that Mayhew reported working a total of 757.25 hours and that she was paid a total of $11,878.14. Therefore, as Defendant points out, even assuming that she worked a total of 100 hours in overtime, the rate that she would have earned for her base pay still comes to $13.09 per hour,

[3] In light of this holding, the Court need not address Defendant's additional argument that Mayhew's activities would not constitute compensable work under FLSA or that its offer of judgment would render this claim moot.

exceeding the federal and state minimum wage. *See Lundy v. Catholic Health System of Long Island Inc.*, 711 F.3d 106, 116 (2nd Cir. 2013) ("So long as an employee is being paid the minimum wage or more, FLSA does not provide recourse for unpaid hours below the 40–hour threshold, even if the employee also works overtime hours the same week."). Thus, the Court also **grants** summary judgment on Plaintiff's state and federal minimum wage claims.

**III. Promissory estoppel**

Plaintiff appears to put forth two theories for her promissory estoppel claim. In her amended complaint, she claims that she "reasonably relied upon Defendant/ Hermitage management's promise of shared revenues and a promotion" regarding the future business plans for the horses and that "Defendant's decision to terminate her under these circumstances gives rise to a claim for wrongful discharge." In her opposition to Defendant's instant motion, however, Plaintiff puts forth a different theory for this claim, asserting in a footnote that "this pleading has been amended through discovery by mutual consent of the parties." She now argues that the Hermitage Club's decision to terminate her "for adhering to the Club's own governing principles was unlawful" because Defendant's request that its employees sign its Business Ethics policy constituted

"an inherent promise not to discipline those employees who acted in accordance with its provisions."

Under Vermont law, "promissory estoppel may modify an at-will employment relationship and provide a remedy for wrongful discharge." *Foote v. Simmonds Precision Products Co.*, 613 A. 2d 1277, 1280 (Vt. 1992). However, contract modifications arising from a claim of promissory estoppel must be specific to the type of promise the employer allegedly made unless the promise itself centers on requiring just cause for termination. In cases alleging specific modifications, "employees for an indefinite term are still considered at-will employees, who may be discharged for any number of reasons not prohibited by the modifications." *Id.* In *Foote*, for example, the court upheld a decision in which an at-will relationship was modified by an employer's handbook, so as to prohibit the plaintiff from being discharged specifically for the pursuit of grievances in accordance with the handbook.

Plaintiff's first theory fails to point out specific modifications to the at-will relationship. In other words, even assuming that management had sufficiently promised shared revenues and a promotion to induce her to work extra hours (a fact which Defendant disputes), there is no evidence to suggest that the Hermitage Club promised to somehow limit the grounds upon which it could terminate Plaintiff. Therefore, even if the

allegation that Plaintiff makes out in her amended complaint is true, it would not give rise to a claim of wrongful discharge.

Plaintiff's second theory addresses this oversight by claiming that Defendant's Business Ethics policy constituted an implicit promise not to discharge employees for acting in accordance with that policy, citing *Foote* to support her claim. However, in *Foote*, the policy at issue explicitly stated that "[i]f you follow these steps, you cannot be criticized or penalized in any way." *Id.* at 568, 1278. The Business Ethics policy cited by Plaintiff does not make any similar promises or assurances or provide employees with a procedure for making complaints about activity that runs contrary to the terms of the policy. Rather, the policy appears to establish basic ethical conditions for an individual's employment with the company, in order to warn employees that they could be terminated for failing to comply with it. The only instruction given to employees who do have concerns is to "consult with their supervisor" if they have doubts about whether their individual behavior would violate the terms of the policy. Therefore, the policy itself appears to lay out the basic requirements for the job rather than create a promise not to terminate an employee on a particular ground, including advancing the values embraced in the document. Since neither of Plaintiffs' theories of promissory estoppel effectively give rise to a wrongful

discharge claim in this case, the Court **grants** Defendant's motion for summary judgment on Count Three.

**CONCLUSION**

For the reasons set forth above, the Court **denies** Defendant's motion for summary judgment on Plaintiff's claim of wrongful discharge in violation of Vermont's public policy on the mistreatment of animals, but **grants** the motion insofar as Plaintiff alleges that her termination violated public policy regarding the employment rights of members of the National Guard (Count One). In addition, the Court **grants** Defendant's motion with respect to Mayhew's overtime and minimum wage claims (Count Two) and her claim of promissory estoppel giving rise to wrongful discharge (Count Three).

Dated at Burlington, in the District of Vermont, this 30th day of November, 2016.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge